KARA K. MILLER, VA Bar #47821
Email: kara.miller@cfpb.gov
Telephone: (202) 435-7825
LEANNE E. HARTMANN, CA Bar #264787
Email: leanne.hartmann@cfpb.gov
Telephone: (415) 844-9787
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Facsimile: (202) 435-7329
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| Consumer Financial Protection Bureau,<br><br>Plaintiff,<br><br>v.<br><br>Davit Gasparyan, a/k/a David Gasparyan,<br><br>Defendant. | Case No. 2:16-cv-2725<br><br>COMPLAINT FOR VIOLATIONS OF THE CONSUMER FINANCIAL PROTECTION ACT OF 2010 |

**Introduction**

The Consumer Financial Protection Bureau (Bureau) brings this action against Davit Gasparyan, a/k/a David Gasparyan, (Defendant or Gasparyan) under the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5536(a)(3), 5564, 5565. Gasparyan co-founded D and D Marketing, Inc., d/b/a T3Leads (T3), a lead aggregator that sells consumer-loan applications as "leads" to small-dollar

1

lenders and other purchasers. T3 failed to vet or monitor its lead generators and lead purchasers, exposing consumers to the risk of having their information purchased by actors who would use it for illegal purposes. T3 allowed its lead generators to attract consumers with misleading statements and took unreasonable advantage of consumers' lack of understanding of the material risks, costs, or conditions of the loan products for which they applied. T3's conduct was unfair and abusive, in violation of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1). Gasparyan knowingly or recklessly provided substantial assistance to T3 in its unfair and abusive acts and practices, in violation of the CFPA, 12 U.S.C. § 5536(a)(3).

**Jurisdiction and Venue**

1. This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

2. This Court has personal jurisdiction over the Defendant because the causes of action arose from the Defendant's conduct of business in this District, and the Defendant resides here. 12 U.S.C. § 5564(f).

3. Venue is proper in this District because a substantial part of the acts or omissions giving rise to the claims occurred here, and the Defendant transacted

business in this district and resides in this district. 28 U.S.C. § 1391(b), (c); 12 U.S.C. § 5564(f).

### Parties

4.  The Bureau is an independent agency of the United States charged with regulating the offering and providing of consumer-financial products and services under "Federal consumer financial laws." 12 U.S.C. § 5491(a). The Bureau is authorized to initiate civil actions in federal district court, by its own attorneys, to address violations of "Federal consumer financial law." 12 U.S.C. § 5564(a)-(b).

5.  Gasparyan is a co-founder of T3 and was the Chief Financial Officer from the company's founding in 2005 until 2009 and the Chief Marketing Officer from the company's founding through July 2014. Gasparyan had managerial responsibility for T3 and materially participated in the conduct of its affairs. Gasparyan resides in this District and, in connection with the matters alleged, transacted business here.

### Factual Background

6.  D and D Marketing, Inc., d/b/a T3Leads, is a California S-Corporation with its principal place of business at 4000 West Alameda Avenue, Suite 200, Burbank, California, 91436. T3 is in the business of receiving consumer-loan

3

applications from lead generators and selling the applications as leads to small-dollar lenders.

7. Gasparyan co-founded T3 in 2005 and claims to own 50% of the company.

8. Gasparyan served as Chief Financial Officer from the company's founding in 2005 until 2009 and as Chief Marketing Officer from the company's founding through July 2014.

9. Gasparyan had substantial control over and involvement in the establishment of T3's business policies and practices.

10. T3 has a network of lead generators from which it receives applications and a network of purchasers to which it sells those applications. T3 sometimes acted as its own lead generator, accepting applications directly from consumers.

11. T3 does not share the identities of its lead generators with its purchasers, and T3 does not share the identities of its purchasers with its lead generators.

12. Lead generators operate websites that advertise loans and through which consumers submit loan applications. Lead generators transfer the applications to T3, and T3 sells the applications to purchasers in its network.

13. The purchasers include online small-dollar lenders, as well as data managers, data brokers, and remarketing companies.

14. Lenders to which T3 sells applications extend credit in the form of small-dollar loans for use by consumers for personal, family, or household purposes, with an expectation that the principal, interest, and fees will be collected from consumers.

15. Data managers are intermediaries for lenders that outsource their lead-purchasing activities, and data brokers are lead aggregators that have their own networks of purchasers to which they sell applications after they purchase them from T3. T3 does not know the end purchasers of the applications it sells to data managers or data brokers. Remarketing companies buy consumer information to send marketing materials to consumers for products other than the loans for which consumers applied.

16. To filter and sell applications to purchasers, T3 uses a "ping tree," which sets the order in which purchasers have the opportunity to purchase a given application from T3. The position of each purchaser in the ping tree is determined primarily by the price the purchaser is willing to pay T3 for that application; the higher the price, the better the purchaser's position in the ping tree.

17. Gasparyan shared responsibility for deciding the position of each purchaser in the ping tree and designed T3's systems to filter and sell applications

in the manner most profitable to T3, without regard for the practices of lead generators or purchasers.

18. A consumer who submits a loan application on a lead generator's webpage is immediately redirected from that page to a lender's webpage. This automated process takes just seconds, and the consumer is not informed that the loan application has been filtered through T3 or sold by T3.

19. T3 does not continuously monitor lead generator websites to check for misleading or inaccurate statements to consumers.

20. T3 regularly accepts applications from lead generators whose websites include misrepresentations that are likely to mislead consumers into believing that lenders to which they will be directed have been evaluated and meet certain standards, such as following rules and practices set by industry associations and government agencies or offering reasonable rates.

21. T3 also accepts applications from lead generators who have incorrectly represented that they are themselves lenders and lead generators who have falsely suggested that they would help consumers find the best rates or lowest fees or that they would review consumers' applications to match them with the most appropriate lenders.

22. Despite the representations to consumers by some of them, T3's lead generators typically do not provide loans directly to consumers, do not select the

6

lenders that will see a consumer's application, and have no involvement in determining or knowledge of the specific terms of the loan a consumer receives after T3 sells the application. Indeed, lead generators forward applications to T3 without regard for how the consumers' information will be used.

23. T3 does not require its purchasers to provide T3 with the precise loan terms that consumers will be offered, and T3 makes no attempt to match consumers with the best loan for their needs, as consumers are led to believe by some lead generators.

24. T3 has reason to believe or knows that the applications it sells are likely to result in loans with interest rates that exceed state usury limits or otherwise fail to comply with laws of the state where the consumer is located. T3 knows in advance of its sales the application parameters each of its purchasers will accept, and T3 knows the identity of each purchaser. T3 sells to these purchasers based on its own financial interests, without regard to representations to and expectations of consumers.

25. T3 does not require data managers or data brokers to disclose the ultimate purchasers of T3's applications. T3 therefore does not know the identity of all lenders that obtain consumer applications through its lead-purchaser network.

26. T3 does not vet or monitor the purchasers in its network for compliance with applicable laws.

7

27. Many of T3's lenders are entities organized by Indian tribes, known as tribal lenders, or organized under the laws of foreign jurisdictions, known as offshore lenders. These lenders typically claim immunity from state regulation, do not comply with the laws of the states where the consumers to which they make loans are located, and do not concede that they are subject to jurisdiction in a forum convenient to the consumer. T3 fails to provide accurate information to consumers about the purchasers in T3's network.

28. Tribal lenders and offshore lenders typically charge higher interest rates than lenders adhering to state laws. Because they charge higher interest rates, these lenders generally are willing to pay more for applications and thus rank at the top of the T3 ping tree.

29. Many of the tribal lenders among T3's purchasers offer contracts providing for the application of tribal law to the contract and providing an exclusive tribal dispute-resolution process.

30. Certain entities operating or purporting to operate in the small-dollar-loan industry have engaged in a variety of fraudulent schemes involving applications purchased from lead aggregators. T3 knew or should have known of such fraudulent actors in the small-dollar-loan industry and the risk of illegal actors purchasing its applications.

31. In 2013, T3 requested information regarding whether its purchasers complied with the laws of the states where they made loans. Many of its purchasers failed to respond to this request, but T3 continued to do business with them.

32. Purchasers provide regular feedback to T3 regarding the quality of the purchased applications, including the number of applications that result in loans and reasons why some did not result in loans. T3 uses this information to evaluate its lead generators and refine its processing to optimize "conversion," or the rate at which applications result in loans. This optimization is conducted for T3's benefit—to sell more applications.

33. T3 controls the information shared between its lead generators and its purchasers, allowing lead generators to claim ignorance of the terms of the loans offered to consumers and allowing purchasers to claim ignorance of the methods used to attract consumers. T3's process allows some purchasers to receive applications that they have been prohibited from soliciting directly.

**Count I**
**Substantial Assistance in T3's Unfair Acts and Practices**

34. Plaintiff realleges and incorporates by reference paragraphs 1-33 of this Complaint.

35. The lenders to which T3 sells applications are "covered persons" under the CFPA—they extend credit for use by consumers for personal, family, or household purposes. 12 U.S.C. § 5481(15)(A)(i).

9

36. T3 provides a material service to covered persons in connection with the offering or provision by the covered persons of a consumer-financial product or service. T3 is a "service provider" to covered persons under the CFPA. 12 U.S.C. § 5481(26)(A).

37. An act or practice is unfair if it causes or is likely to cause substantial injury to consumers that is not reasonably avoidable by consumers and is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. § 5531(c)(1).

38. T3's lead generators make statements to consumers regarding the lenders that will receive the consumers' information and the loans those lenders will offer.

39. T3 knows or should know of the lead generators' statements and that they are often false and misleading.

40. T3 does not vet or monitor its purchasers for illegal activity.

41. T3 does not require data managers or data brokers to disclose the end purchasers of applications.

42. Consumers are not notified that T3 is involved with processing their loan applications and cannot reasonably investigate or assess the reliability of the lenders to which their applications are ultimately sold.

43. T3's conduct is likely to cause substantial injury to consumers.

44. The potential benefit of obtaining a loan is not outweighed by the likelihood of injury from T3's failure to vet and monitor its purchasers.

45. T3's conduct constitutes an unfair act or practice under 12 U.S.C. §§ 5531(c)(1), 5536(a)(1)(B).

46. Gasparyan had significant responsibility for establishing T3's policies and practices, and, throughout his employment at T3, he had substantial control over T3 operations.

47. Gasparyan knowingly or recklessly provided substantial assistance to T3, a service provider engaged in unfair acts and practices, in violation of the CFPA, 12 U.S.C. § 5536(a)(3).

## Count II
## Substantial Assistance in T3's Abusive Acts and Practices

48. Plaintiff realleges and incorporates by reference paragraphs 1-33 of this Complaint.

49. The lenders to which T3 sells applications are "covered persons" under the CFPA—they extend credit for use by consumers for personal, family, or household purposes. 12 U.S.C. § 5481(15)(A)(i).

50. T3 provides a material service to covered persons in connection with the offering or provision by the covered persons of a consumer financial product or service. T3 is a "service provider" to covered persons under the CFPA. 12 U.S.C. § 5481(26)(A).

11

51. An act or practice is abusive if it "takes unreasonable advantage of . . . a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service." 12 U.S.C. § 5531(d)(2)(A).

52. Contrary to representations by lead generators, consumers are likely to be steered, through T3's ping tree, to lenders offering less-favorable terms than may otherwise be available to them. In particular, consumers are likely to be steered to lenders that charge higher interest rates than lenders that comply with state laws, that do not adhere to state usury limits, or that claim immunity from state regulation and jurisdiction. Consumers also are likely to be steered to lenders that offer contracts providing for the application of tribal law to the contract and providing an exclusive tribal dispute-resolution process.

53. The possibility of being matched by T3 with a lender that offers less-favorable terms than may otherwise be available is not disclosed to consumers by lead generators or T3. Only after consumers are filtered through the T3 ping tree and redirected from a lead generator's page to a lender's e-signature page can consumers find the offered terms and links to lengthy disclosures where lenders reveal material terms such as their tribal affiliation and claimed immunity.

54. The inaccurate statements by T3's lead generators decrease the likelihood that consumers will read the lengthy disclosures on a lender's webpage.

12

55. The cost of a loan relative to what other lenders might offer, the law governing a loan contract, including whether the lender complies with laws of the consumer's state, and the available forum for raising disputes with the lender or in which the consumer might be sued by the lender are material risks, costs, or conditions.

56. T3 knows or should know of lead generators' representations to consumers. T3 knows or should know that its process results in many, if not most, applications being steered to lenders that make loans to consumers that do not comport with express or implied representations made on lead-generator websites.

57. T3's conduct takes advantage of consumers' lack of understanding of the material risks, costs, or conditions of the products for which they apply and constitutes an abusive act or practice under 12 U.S.C. §§ 5531(d)(2)(A), 5536(a)(1)(B).

58. Gasparyan had significant responsibility for establishing T3's policies and practices, and, throughout his employment at T3, he had substantial control over T3's operations.

59. Gasparyan knowingly or recklessly provided substantial assistance to T3, a service provider engaged in unfair acts and practices, in violation of the CFPA, 12 U.S.C. § 5536(a)(3).

**Prayer for Relief**

Wherefore, the Plaintiff requests that the Court:

1. award injunctive relief as may be necessary to prevent consumer injury during the pendency of this action and to preserve the possibility of effective final relief;

2. permanently enjoin Defendant from committing future violations of the CFPA or any provision of "Federal consumer financial law," as defined by 12 U.S.C. § 5481(14);

3. grant additional injunctive relief as may be just and proper;

4. award damages or other monetary relief against Defendant;

5. order Defendant to pay redress to harmed consumers;

6. order disgorgement of ill-gotten revenues from Defendant;

7. impose civil money penalties against Defendant;

8. order Defendant to pay Plaintiff's costs and fees incurred in connection with prosecuting this action; and

9. award additional relief as the Court may determine to be just and proper.

Dated: April 21, 2016                    Respectfully submitted,

/s/ Leanne E. Hartmann
Leanne E. Hartmann (CA Bar #264787)